THE BELOIT AND MADISON RAILROAD COMPANY VS. PALMER.

Where a committee was appointed by the inhabitants of a town, to obtain subscriptions to the stock of a railroad company, which were to be delivered to the company only upon certain parol conditions; *Held*, that a member of said committee, acting as such, was not an agent of the railroad company in such a sense as to prevent his receiving the subscription list as an *escrow* ; and if he delivered it to the company without the consent of the subscribers, and without a fulfillment of the conditions, such delivery was not binding.

APPEAL from the Circuit Court for *Dane* County.

Action to recover the amount of an alleged subscription by the defendant to the stock of the plaintiff. After denying the material allegations of the complaint, the answer avers, as a special defense, that in 1862 the defendant, with several other residents of the town of Oregon, in Dane county, agreed with each other to take stock in said railroad company, provided its track and depot, in said town, should "first be located, established, built and constructed" at the east of the village of Rome Corners ; and said other residents, with this mutual understanding and agreement, procured one of the blank forms used in obtaining lists of subscriptions to the capital stock of said company, and said other residents signed their names to it. One Bedford called on defendant to procure his name to said list,

and defendant refused to sign, but told Bedford that if the company located and built its track and depot as above described, he, said Bedford, might sign his (defendant's) name to the list, but not otherwise.  Bedford afterwards signed defendant's name to the list without any other authority than as above stated.  After the list was so signed, it was put into the hands of a committee of citizens of said town of Oregon, selected by the signers upon said list, with instructions to the committee not to deliver the same to the plaintiff until said track and depot should be located and constructed as above described, and said subscribers and the defendant should be satisfied therewith.  Afterwards the plaintiff located and constructed its track and depot at the *west* end of said village of Rome Corners, to the great injury of the defendant, who, immediately upon his ascertaining the fact, called upon said committee, and required his name, if upon said list, to be erased, and directed them not to deliver said subscription with his name thereon to the plaintiff.  These facts were well known to the plaintiff, and its possession of said subscription list, if it ever acquired such possession, was acquired in fraud of defendant's rights.

On the trial the plaintiff put in evidence a paper containing subscriptions to its stock, including one for six shares in the name of the defendant, and proved by Bedford that he signed the defendant's name to said subscription list, and was authorised by defendant to do so ; and also proved calls for payments on said stock, and non-payment by the defendant.  On cross-examination, Bedford was asked (under objection by the plaintiff), "For whom were you acting?" and answered: "I was not employed by the railroad company.  Mr. Clinton and Mr. Bennett [agents of the company] were there, and brought this [subscription] paper to me.  I suppose I was not acting for the company."  The defendant's evidence tended to show that Bedford, in procuring subscriptions, acted as one of a committee appointed at a meeting of the inhabitants of the town of Oregon.  Defendant testified that Bedford came to him while

at work in his harvest field, and requested him to subscribe, which he refused to do except upon certain conditions. "The conditions were, that the road was to be located where talked of at the meeting the night before, and the paper was not to be delivered until we were satisfied that the road and depot would be located as talked, on the east side of the village of Rome Corners. Mr. Bedford and I were both at that meeting the night before. He referred to that meeting in the harvest field. When I hesitated some about having my name go on the paper, he said, ' You know we all have it in our hands. This committee appointed last night are to hold the subscription until the conditions I have before stated are complied with.' I told him, under those circumstances and the promises made, he might sign my name." *Question:* " What did he respond when you suggested that there might be a catch?" *Answer:* "He said, 'I pledge you my word and honor that the paper shall never be given up until we are satisfied the road shall be built and the depot located where the profile shown last night showed it would go, just east of the Corners. I did not read the subscription paper at the time. He said 'It is not necessary you should read it; the paper is in my hands, and it wont be given up unless it is all right.' * * * Something was said in the harvest field about the depot. I think Bedford said that probably the depot would be east of the Corners on Waterman's man's land. * * I think the committee were appointed at the suggestion of Clinton or Foote. They were representing the company. It was talked at the meeting that the depot was to be located on Waterman's land. I could not say that the agents of the company talked this, or that they did not. The profile exhibited at the meeting by Clinton showed the location of the road and depot on the east side of the village. There was no question at that time but what the road was to be built on the east side. I know of no record being kept of that meeting." John S. Frary, for the defense, testified that

he was a resident of the town of Oregon, and was present at the meeting when the committee were appointed [consisting of six members whom he named] at the suggestion of Clinton and Foot; that Bennett [who represented the company] objected to two, and two others were put in their places; that Bedford was the only one of the committee that acted, so far as witness knew; and that he did not see Bennett or Clinton acting in getting stock subscriptions. Mr. Bedford was recalled by the defendant, and on his cross-examination by the plaintiff, said: " I can state but very little of what was said in the harvest field between *Palmer* and me. Not much was said. I was there a very few minutes; perhaps five minutes. I think some little was said about the amount he should put down; only little of this. As far as the track of the road was concerned, we all understood that it was to go on the east side of town, for that was talked at the meeting, and *Palmer* was there. I don't remember whether anything was said in the harvest field about the railroad being on the east side. It was generally understood that the committee were to hold the subscription until we were satisfied that the road would be built, and the money expended on the line of the road in Oregon. This was understood by all. I can't recollect anything said in the harvest field contrary to this understanding. * * * I think it was stated in the meeting that the depot was to be on the east side of town, on Mr. Brown's or Mr. Main's land. The depot would be about forty rods from where it now is. I think there was nothing said at the meeting about the depot being built on Waterman's land. * * At the time of my visiting *Palmer*, my name was on the list as a subscriber." *E. D. Clinton*, for the plaintiff, testified as follows: " I was agent of the company. The meeting at Oregon was held at my request. I was present. I carried there blank subscriptions and a contract, or proposition, of the Galena & Chicago Union Railroad Company to build the road. If the people would take $10,000 stock, the road would be built to Oregon.

The subscription and contract were read. Mr. Bennett, Foot and I spoke. A committee was appointed at the meeting to take stock, at my suggestion. I don't remember that anything was said at the meeting about the location of the road. I had instructions to get the right of way, and had a plat of the line on the eastside. I showed that plat the night before. On this plat the depot was designated; and the [people showed me where the depot was located." *Question* : "State on what conditions, if any, the committee were authorized to receive and deliver stock subscriptions." This question was ruled out. "I suggested that if the people would take a certain amount of stock and donate the right of way, the road would be built to Oregon ; and that when the grading and bridging were under contract to Oregon, and work commenced, the subscription should belong to the company ; and that the committee might keep the subscriptions until the contracts were let and work commenced. *  *  I think I did not state at that meeting that the citizens must collect stock. I suggested the appointment of a committee to assist me in taking stock. I did not go with the committee to get stock."

Mr. Bedford testified that he was never authorized by the committee of citizens to deliver the subscription list in question to the plaintiff ; that he never did deliver it in fact to the plaintiff or any of its agents ; that it, as well as other papers of the railroad company, was kept in his safe ; and that he did not know at what time it passed out of his possession. There was evidence, on the other hand, tending to show that he delivered said list to a person acting as agent of the company, who asked for the same as such agent.

The court refused the following instructions asked by the plaintiff: "1. A subscription list is a mutual contract between two or more parties, and a formal delivery is not essential to its validity. 2. If the jury find that Bedford procured the subscription by authority of the railroad company, then any agreement between a subscriber and Bedford as to the condi-

tions of delivery of such subscriptions, not appearing in the subscription list itself, would be of no effect, and the delivery to Bedford would be a delivery to the company. 3. If the jury find that the subscription list was delivered to Bedford in *escrow*, upon the performance of the conditions of *escrow* the rights of the company to the paper became absolute, without a formal delivery. 4. *Palmer* must prove clearly and beyond a doubt the conditions upon which the paper was delivered; if not so proved, the delivery to Bedford will be absolute." The court instructed the jury as follows : "1. Unless the subscription list has been delivered to the plaintiff by the consent of the defendant, the suit cannot be maintained. 2. If at the time the defendant signed this subscription, or authorized it to be signed, it was agreed that the same should not be surrendered to the plaintiff unless the railroad was built and lo· cated at the east of the village of Rome Corners, and it has been delivered without such condition being complied with, such delivery does not bind the defendant. 3. If you find that Bedford was authorized by the plaintiff to procure subscriptions for stock, and that defendant authorized and directed Bedford to sign his name to the subscription list for certain shares of stock, upon the condition that the subscription lists should not be delivered to the company, *or* should not be used by it, *or* that the subscription list should remain in the keeping of a committee of citizens, unless the railroad should be built on the east side of the village of Rome Corners, then the plaintiff cannot recover without showing tnat such condition was complied with and performed. Such condition attached to the delivery of the subscription list, is valid, and may be proved by parol evidence."

Verdict and judgment for the defendant; 'and the plaintiff appealed.

*Stevens & Lewis*, for appellant :

No condition affecting the terms of subscription, which was not embodied in the written agreement, can be enforced. *Plank*

The Beloit & Madison Railroad Co. vs. Palmer.

*Road Company v. Griffin*, 21 Barb., 454; *Martin v. R. R. Co.*, 8 Florida, 370; Pierce on Am. R. R. Law, 71, 72; 2 Abb. Dig., p. 139, (199), (200). Even "fraudulent representations of one of the company's officers, made at a public meeting and in the presence of a majority of the board of directors, but not made by any authority from such board by resolution or otherwise," and inducing the defendant to subscribe, would not be a defense. *B. & N. Y. C. R. R. Co. v. Dudley*, 4 Kern., 336. The signature of the defendant by Bedford is binding. 21 Barb., 454. In taking the subscriptions of the defendant and others, Bedford acted as the agent of the plaintiff, as is shown by Mr. Clinton's testimony. At the time of applying to defendant, he was himself a stock subscriber. As such he was a part of the company and benefitted by the subscription. 16 Mass., 94 (100); 1 Sandf. Ch., 411; 15 M. &. W., 308; 16 id., 804. Delivery in *escrow* can only be to a stranger; if made to the party or his agent, it is absolute, and the instrument takes effect presently as the deed of the grantor discharged of the conditions on which the delivery was made. *Worrall v. Munn*, 5 N. Y., 229; *Wight v. Shelby R. R. Co.*, 16 B. Mon., 5; *Arnold v. Patrick*, 6 Paige, 310; *Fairbanks v. Metcalf*, 8 Mass., 238; *Ward v. Lewis*, 4 Pick., 520; *Lawton v. Sager*, 11 Barb., 349; Redfield on Railways, 89 (note).

*J. H. Carpenter*, for respondent.

*By the Court*, DIXON., C. J. I think that Bedford was not the agent of the railroad company so that a delivery to him was a delivery to the company; or so that the condition may not be shown to defeat the subscription in the hands of the company. I do not see how he was the agent of the company in any sense, but if he was, it was a qualified and subordinate agency growing out of his appointment as one of the committee on the part of the subscribers. The company never made him its agent, and he had no authority to act for it except what is to be inferred from the fact that he was permitted as

a member of the committee to solicit and receive subscrip·
tions, and that he might have done without such permission.
It is clear from the evidence that he was primarily the agent
of the subscribers. As such he received the subscription, and
as such it was competent for him to take and hold the list as
an *escrow.* I think for this purpose he is to be regarded sole·
ly as the agent of the subscribers. It is also equally clear
from the evidence that he received the subscription list to be
delivered to the company upon a condition which has never
been performed. It is therefore inoperative in the hands of
the company as against the defendant. In this view we
see no error in the giving or refusing of instructions, and
nothing in the admission or rejection of evidence for which
the verdict ought to be disturbed.

Judgment affirmed.