REHBEIN and others, Appellants, vs. RAHR and another, imp., Respondents.

*October 16, 1900 — February 26, 1901.*

*Banks and banking: Certificate of incorporation: Intent of signers: Who are stockholders: Rescission: Nature and extent of individual liability to creditors: How enforced.*

1. The certificate of incorporation of a bank organized under the banking act, upon the recording of which in the office of the register of deeds the signers become a corporation, when filed for record and acted upon must be given full effect, according to its terms, against those who executed it, although such filing may have occurred in contravention of the understanding and directions of some of them; and the obligations thereby incurred by such signers inure to the benefit of all persons dealing with the corporation on the faith of its status as such, though they did not know the names of the incorporators.

2. The intent of the signers of the certificate of incorporation of a bank, and the force and effect of their act, must be determined from the instrument itself, the terms of which cannot be varied or contradicted by parol nor by inference as to the intent or purpose of those executing it; and any ambiguity in the instrument is to be resolved most strongly against the signers, and so as to give some instead of no effect to their acts.

3. Subsecs. 18 and 19 of the banking act (sec. 2024, Stats. 1898) provide that "any number of persons may associate . . . and may become incorporated;" that "such persons . . . shall make a certificate," stating the amount and number of shares of the capital stock and the names of the stockholders; and that upon the recording of such certificate they become a corporation. No other provision requires that any given amount of stock shall have been subscribed before the corporation engages in business. *Held*, that those who constitute the original corporation must be the holders of all the stock thereof, and their relationship as such stockholders arises immediately upon the coming into existence of the corporation.

4. A certificate of incorporation of a bank named "W. R.'s Sons" as the holder of twenty-five shares of stock, and was signed by two of the three sons of W. R. who constituted the firm of W. R.'s Sons. *Held*, that, the firm not being bound thereby, the members sign-

Rehbein and others vs. Rahr and another.

ing the certificate became the holders of the twenty-five shares mentioned, the conclusive presumption being that they intended to bind whom they could within the description adopted.

5. A day or two after the signing of the certificate, one of said signers notified the promoter of the corporation, who held the paper, that they had reconsidered, and declined and refused to become stockholders, but the promoter nevertheless proceeded to file the certificate bearing their names and stating that W. R.'s Sons held twenty-five shares. Subsequently, when he tendered them a certificate of stock, they refused to accept it, and he took it away, but it was never destroyed, and the officers of the bank, in their reports to the state treasurer, included W. R.'s Sons in the list of stockholders. *Held*, that there had been no effective rescission of the agreement of said signers or termination of their status as stockholders.

6. Under subsec. 47 of the banking act (providing that the stockholders in every corporation organized thereunder "shall be individually responsible to the amount of their respective share or shares of stock for all its indebtedness and liabilities of every kind"), the individual liability of a stockholder is not, as to creditors, a ratable or proportional liability, but is limited only by the amount of his stock and by the amount of unpaid debts of the corporation. Within those limits it is a primary and absolute liability, upon which any creditor (however small his claim in proportion to the total indebtedness) may sue and recover in full; though to prevent inequality and preference any such creditor must proceed in equity, so that opportunity can be given to all other creditors to share in the fund and the rights of all stockholders to contribution or otherwise may be protected and finally determined.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, JR., Circuit Judge. *Reversed.*

The T. C. Shove Company, a state banking corporation, having assigned April 12, 1892, plaintiffs, being creditors of said bank to the extent of $2,800 out of an aggregate of about $485,000, brought suit against defendants, nominally impleading with them the corporation and the other stockholders thereof, who, however, were not served with process, they being alleged to be insolvent. The action was brought by plaintiffs for the benefit of the creditors of said

Rehbein and others vs. Rahr and another.

corporation, and to enforce the statutory liability of the defendants *Rahr*, under subsec. 47, sec. 2024 [p. 1537], Stats. 1898, for an additional amount equal to the par value of the stock claimed to have been held by them.

It appeared that in 1884, preliminary to the organization of the Shove Bank by T. C. Shove, theretofore a private banker, these defendants, with their brother, Max Rahr, constituted a business partnership under the name of William Rahr's Sons; that Shove spoke to *William Rahr* about his firm becoming a stockholder for twenty-five shares in the proposed banking corporation; that *William*, after talking with *Reinhardt*, expressed his own and *Reinhardt's* approval of such proposition, and they, at the request of Shove, signed their names to a certificate of incorporation under the bank incorporation statute (now sec. 2024, Stats. 1898), with the understanding, as found by the court, that such signature was only for the purpose of performing their individual part towards constituting the firm of William Rahr's Sons a stockholder, and that, in order to bind the firm, the other member was to subscribe and acknowledge, to accomplish which blanks were left for the name of Max Rahr.   The court further found that there was no intent or understanding on the part of any one that *William Rahr* or *Reinhardt Rahr* should, individually or jointly, become contracting parties by virtue of their signatures.  Max, on being informed of what they had done, did not approve, and thereupon, a day or two after their signatures had been affixed, *William* notified Shove, who held the paper, that they had reconsidered, and declined and refused to become stockholders.   All this was nearly a month before the papers were filed with the register of deeds to create the corporation.

Thereafter, on June 3, 1884, Shove, notwithstanding said notification, did file the certificate in question bearing the names of *William Rahr* and *Reinhardt Rahr*, and specifying

among the list of stockholders "William Rahr's Sons, of
Manitowoc, Wis., holds twenty-five shares." Subsequently,
about July 1, 1884, Shove brought and tendered to *William
Rahr* a certificate of stock for twenty-five shares. *Rahr*
refused, saying that the firm had declined to become a stock-
holder, and would not take it, and persisted in such refusal,
although Shove offered to accept the note of the firm for this
amount, whereupon Shove took the certificate of stock away.
It appears that it was never destroyed, and that the stub in
the stock book continued to show certificate No. 16, twenty-
five shares, in the name of William Rahr's Sons, although
it did not show any signature to the receipt therefor printed
on the stub. Thence onward the officers of the bank con-
tinued, in their reports to the state treasurer, to include
William Rahr's Sons among the list of stockholders, but of
none of such facts had the respondents any knowledge. It
does not appear that lists of stockholders were at any time
after the incorporation filed with the register of deeds.

The insufficiency of the general assets of the bank to pay
more than about twenty-nine per cent. of its debts was found.
There was evidence that most of the plaintiffs had news-
paper information at the time of the incorporation of the
bank in 1884 that William Rahr's Sons were stockholders,
and plaintiff *Stolze* had seen the reports of the state treasurer
from time to time thereafter containing their names, and
had examined the record of certificate for incorporation in
the register's office. The court found that neither *William
Rahr* nor *Reinhardt*, nor both of them, were by the plaint-
iffs supposed to be holders or owners of any of the capital
stock of said bank. There was no evidence as to whether
any other creditors had knowledge or information, before
the assignment, of any connection of respondents with the
bank. The court found as a fact that at none of the times
involved did the respondents *William Rahr* or *Reinhardt
Rahr*, either jointly or severally, own or hold any of the

capital stock of the insolvent banking company. Judgment was entered dismissing the complaint, from which the plaintiffs appeal.

For the appellants the cause was submitted on the briefs of *Timlin, Glicksman & Conway.*

For the respondents there was a brief by *Nash & Nash,* attorneys, and *F. C. Winkler,* of counsel, and oral argument by *Mr. Winkler.*

Dodge, J.  The liability sought to be enforced in this action has been subject to many decisions in this court, the result of which is that it is strictly and distinctively contractual, but contractual not because of express agreement, but because of the statute (Stats. 1898, p. 1537, sec. 2024, subsec. 47): " The stockholders in every corporation or association organized under the provisions of this act shall be individually responsible to the amount of their respective share or shares of stock for all its indebtedness and liabilities of every kind."  Every individual who brings himself within its terms must be held to have contracted and agreed that he will pay all liabilities under which the bank may at any time labor while he continues that relation, to an amount, however, not exceeding the par value of his stock.  The contract is said to be between him and each of the creditors. By reason, however, of the fact that all creditors have an equal right to share in that liability, and that each stockholder has a right that every other shall contribute to defray the aggregate thereof, it has been held that the proper method of enforcement is not through a suit at law by one of such creditors against one or more of such stockholders, but by all creditors against all stockholders who can be brought within the jurisdiction, together with the corporation, as defendants.  *Coleman v. White,* 14 Wis. 700; *Finney v. Guy,* 106 Wis. 256; *Eau Claire Nat. Bank v. Benson,* 106 Wis. 624.

Since this contract is implied from the statute, its scope
is limited thereby.    That statute imposes the liability upon
stockholders, and no others.    The primary question, there-
fore,— and, indeed, that most litigated in the present case,—
is, Were the respondents stockholders of the defendant cor-
poration?    The circuit court evidently faced exactly this
proposition, and held that the respondents never became
stockholders, predicating his conclusion on one specific find-
ing of fact, namely, that they did not execute the certificate
of incorporation.    True, they signed their names to it, but
he found as fact that the signature was preliminary only,
and understood by all parties to be as if not done until con-
summated by the assent and signature of the third member
of the firm of William Rahr's Sons, Max Rahr.    Assuming
the facts of the transaction to be as found by the court, the
first and vital question is whether his conclusion of non-
stockholding by these defendants may lawfully be drawn
therefrom, notwithstanding the fact that by the filing of the
paper bearing their signatures they were apparently share-
holders.

It must be conceded that the general rule is perfectly
well settled by the decisions of this state that a document
which requires delivery to be effectual is wholly ineffectual
unless voluntary delivery thereof be made; that otherwise
such paper never comes into existence as a legal instru-
ment.    This was decided as early as *Everts v. Agnes*, 4 Wis.
343, and has been reiterated in *Beloit & M. R. Co. v.
Palmer*, 19 Wis. 574; *Walker v. Ebert*, 29 Wis. 194; *Kellogg
v. Steiner*, 29 Wis. 626; *Tisher v. Beckwith*, 30 Wis. 55; *An-
drews v. Thayer*, 30 Wis. 228; *Chipman v. Tucker*, 38 Wis.
43; *Hillsdale College v. Thomas*, 40 Wis. 661,— most of which
cases deal with the situation where the signer of a paper
has left it in the hands of a depositary to be delivered only on
certain conditions.    If the paper be delivered contrary to
those conditions, it is of no force or effect,— never comes into

Rehbein and others vs. Rahr and another.

existence as against the signer, and therefore no rights under the same can be acquired by any one, however innocent, or for value, unless the signer's conduct is so characterized by negligence as to estop him against an innocent holder from denying responsibility upon the paper. The deposit with a reasonably responsible person as a custodian, to deliver only on certain conditions, is held not negligent. *Everts v. Agnes, supra.* Chief Justice DIXON said, in *Walker v. Ebert, supra* (p. 197): "The inquiry in such cases goes back of all questions of negotiability, or of the transfer of the supposed paper to a purchaser for value, before maturity and without notice. It challenges the origin or existence of the paper itself; and the proposition is, to show that it is not in law or in fact what it purports to be, namely, the promissory note of the supposed maker." These remarks were held applicable to a mortgage delivered contrary to instructions, recorded, and transferred for value to an innocent holder. *Chipman v. Tucker, supra.* These cases fully recognize the distinction between an acquisition of possession which the signer has never authorized or assented to, and the inducing of the signer to make or assent to a delivery, by fraud going to the motives moving such assent. In the latter case the paper becomes effectual as a legal document, subject to be defeated by proof of the fraud, unless legal rights of innocent holders for value have intervened; but in the former it is nonexistent; it is as a paper which the maker never signed, or as one which, his signature having been put to it while in his own possession, is purloined from that possession without his negligence. The question whether the recipient of that paper had or had not knowledge, or was or was not fraudulent in receiving the same, is immaterial. *Beloit & M. R. Co. v. Palmer, supra.*

This principle is very old and thoroughly established at common law, and no exception save that of estoppel by negligence had ever been recognized in Wisconsin until *Belden*

*v. Hurlbut*, 94 Wis. 562, where a contrary rule was applied to a probate bond, largely on the authority of *Dair v. U. S.*, 16 Wall. 1, and *Russell v. Freer*, 56 N. Y. 67, but supported by a large number of other decisions; a distinction being drawn between other documents and such paper as a probate bond, signed by sureties and delivered to the principal obligor or some one acting for him. Such distinction was held to be required on grounds of public policy. It was said that the Wisconsin cases above referred to differ from the case then in hand in that they involve business transactions between man and man only, where the grantee is perfectly able to ascertain and investigate the status of the transaction, and they do not involve the .considerations of public policy, and the preservation of the estates of widows and minors, which are strongly set forth in the quotations made from *Dair v. U. S.*, *supra*, and *State v. Peck*, 53 Me. 284. The rule of *Belden v. Hurlbut* has since, without discussion, been applied to a private bond passing between individuals in *New Home S. M. Co. v. Simon*, 104 Wis. 120, 124, the court there saying that bonds are governed by a different rule from other instruments.

The findings in the case at bar disclose a situation which, on the authority of the Wisconsin cases above cited, would probably defeat a promissory note, mortgage, or other like paper, but would not defeat a probate or public bond similarly deposited. The question, then, recurs whether the rule so well established in Wisconsin, that ordinarily a paper shall have no efficacy whatever unless made current by voluntary delivery, is to be subjected to further exception in favor of documents like that before us, which, in order to become valid and effective, was not to be delivered to an adversely interested individual, who was to acquire his rights thereby, but was to be delivered to the public by filing with the register of deeds, upon whom rests no duty to scan or scrutinize the instrument, or to ascertain any of the facts

bearing upon its due execution or upon the authority of him who files it, but merely to receive and give to it apparent, ostensible authenticity and force by spreading it upon the public records.

It would seem that the question, thus stated, answers itself, in the light of the reasons which induced this court to insist on the validity of probate bonds although no voluntary delivery thereof had occurred. Certainly, more duty and opportunity for scrutiny, precaution, and inquiry rests upon the county judge before the acceptance of a bond which shall give existence and authority to an administrator, guardian, or trustee than rests on the register of deeds in accepting and filing articles of incorporation. Again, those who are to be affected thereby, and who are to rely on the state of facts which depends upon the existence of such paper, are even more remote and unable to protect themselves in the case of the establishment of a bank than in the case of the creation of a court officer. They may have no interest until years after the event, and they may well be as helpless, and as entitled to invoke rules of public policy, as are the widows, orphans, or beneficiaries whose property depends upon the sufficiency of the bond. Such reasons lie at the foundation of the policy of this and other states to place about the business of banking extraordinary restrictions and safeguards to minimize as far as possible the grievous results of insolvency. The disturbance of the business world, and the impoverishment of those who rely on the semi-public character of banks for the safe-keeping of their moneys, are considerations which involve so much of public policy and general welfare that they invite and have received the most anxious care at the hands of both legislature and judiciary. By virtue of his bond the county judge confers upon an administrator custody and control of moneys and property of the few people interested in an estate. By virtue of the public record of incorporation papers

the state confers upon a bank in practical effect the custody
of the moneys of a whole community, whose members, what-
ever their right, have practically not the power of ascer-
taining its safety, but *ex necessitate* rely therefor on the
status the state has given it.   This comparison leaves no
doubt of the duty of a court to adopt for the protection of
the latter situation quite as stringent rules as for the for-
mer.   We are unable, therefore, to escape the conclusion
that all the considerations which justified the decision in
*Belden v. Hurlbut*, 94 Wis. 562, necessitate the holding that
public policy demands that the certificate of incorporation
of a bank, when filed and acted on, must be given full ef-
fect, according to its terms, against those who execute the
same, although its filing may have occurred in contraven-
tion of the understanding and directions of some of them.
This is on the ground of estoppel, but estoppel *quoad* the
state, the benefit of which extends to all those who deal with
the corporation on the faith of its status as such; just as the
contract which would result from intentional execution and
filing of the certificate inures to the benefit of those who
deal with the corporation in after years, though they may
never have known who were the parties thereto as incor-
porators, and may never have relied on the fact that any
particular person was thereby made liable to them.

From the foregoing it results that all of the signers of
the certificate for incorporation of the Shove Banking Com-
pany are placed in exactly the same position as if that doc-
ument had been filed by their direction and with their
assent.   Upon that attitude, however, it is contended by re-
spondents that the paper itself excludes the idea that *Will-
iam Rahr* and *Reinhardt Rahr* were to become holders of
the entire twenty-five shares of stock, because the stock is
listed as to belong to William Rahr's Sons, a firm which
they could not bind.   The question of their intent, and of
the force and effect of their act, must be resolved from the

instrument itself, the terms of which cannot be varied or contradicted by parol nor by inference as to the intention or purpose of those executing. The original force and effect of such instrument is, at the least, to express a contract *by its signers* to take the amount of stock which that certificate declares them to hold. Further, the statute evidently contemplates that the certificate is to be signed by the holders of all of the stock as the corporation is to be originally organized. Stats. 1898, sec. 2024, subsec. 18 (p. 1528), provides that "any number of persons may associate . . . and may become incorporated." Sec. 2024, subsec. 19 (p. 1529): "Such persons . . . shall make a certificate," etc. These provisions leave no doubt that those who are to constitute the original corporation must sign the certificate. But it clearly appears that those who constitute the original corporation must be holders of the capital stock thereof, for the certificate above mentioned is required to state the amount and number of shares of the capital stock and the names and residence of the stockholders. Clearly, this contemplates and requires that the corporation, when created, shall consist of the shareholders already ascertained, and that it shall also consist of "such persons" as make the certificate and thereby "become incorporated." The two classes, shareholders and makers of the certificate, must, of necessity, be identical, in order to give effect to the various calls of this statute. This legislative purpose is rendered the more certain by the fact that in no other manner is any requirement made, as in the case of other corporations, that any given amount of capital stock shall have been subscribed before engaging in business. If this is not what the statute demands, one man, holding one share of stock, may execute and file a certificate, declaring who are the holders of the rest, it is true, but not binding them, and may thus alone "become a body politic and corporate," with all the powers and privileges specified (sec. 2024, subsec. 19, subd. 5),— a result too absurd to be contemplated.

Taking together these two propositions, namely, that the certificate declares that the subscribers have together agreed to take all the stock and the amount which each has agreed to take, and finding that the amount of stock to be held by each of the other signers is specified in the certificate, no interpretation can be adopted other than that *William Rahr* and *Reinhardt Rahr*, who were sons of William Rahr, agreed to become stockholders for the other twenty-five shares in the certificate mentioned. If the contract is ambiguous as to whether by the expression " Wm. Rahr's Sons " is intended those of his sons who have signed, or a partnership consisting of others as well, that ambiguity is to be resolved most strongly against those responsible for it, and so as to give some, instead of no, effect to the acts of the parties. If, by their signatures, the respondents could not constitute the firm a stockholder, it must be presumed that they did not intend to, but did intend to bind whom they could within the description adopted.

Another proposition irresistibly results from the conclusion that the respondents' act in signing the paper was a completed one, namely, that the paper was thereby agreed to be used for the purposes for which the law required it to be executed, and that the act of Shove or any of the other signers of the paper in placing it in the register's office was in accordance with its terms, and thereby created a corporation consisting of the signers as shareholders. That immediately upon the coming into existence of such a corporation all of the signers to this certificate became stockholders therein, is obviously the contemplation of the statute. The organization of banking corporations differs radically, in that respect, from the method prescribed for others. Generally, corporate existence is created by the execution and filing of an instrument by men who may never hold stock, and the relationship of stockholder is created either by the purchase of stock or the subscription

Rehbein and others vs. Rahr and another.

therefor accepted by the corporation. *Badger P. Co. v. Rose*, 95 Wis. 145. In the case of the banking corporation, however, the statute provides that the certificate shall be of actual stockholding, and that statute, upon the filing of the papers so as to constitute the corporation, itself undoubtedly supplied the acceptance, so that the relationship immediately arises. The contract, so soon as the state becomes a party to it by the filing of the certificate, is an executed one. It is not like the promise to marry, which may be effectively broken, but like the contract of marriage, which creates a status irrevocably. 1 Morawetz, Priv. Corp. § 56; *Buffalo & N. Y. C. R. Co. v. Dudley*, 14 N. Y. 336, 346, 355; *Spear v. Crawford*, 14 Wend. 20; *Stanton v. Wilson*, 2 Hill, 153.

Some argument is submitted as to the right or power of these respondents to rescind their contract of subscription, but the question does not present itself for decision, for the present record presents no evidence of any effective rescission. If respondents made any attempt to that end, it could not be effective without consent of their associates and of the corporation, nothing of which is disclosed by the record.

We conclude, therefore, that by the certificate of incorporation, signed by the respondents, and filed with the register, they agreed, with their associates, that it might be used to create a banking corporation, and that upon its creation they should *ipso facto* be and become stockholders therein to the amount of twenty-five shares; that, upon the legal filing of such document, they did become such; that there has been neither rescission of such agreement nor termination of such status; and as a result, that they were, at all times material to their liability, shareholders in such corporation.

Respondents' counsel contend that this suit should not be entertained by a court of equity, because of the trifling interests of the plaintiffs, who hold but $2,800 of claims out of a total of $485,000 proved up in the assignment proceed-

ings.   His insistence is that the limit of defendants' liability
to each creditor is such proportion of the par of his stock as
such creditor's claim bears to the whole amount of debts,
and to these plaintiffs, therefore, is only about $14.50, con-
ceding the insolvency of all other stockholders.   Appellants
insist, however, that defendants are liable to pay the full
par value of their stock, $2,500, if the claims of the creditors
appearing as plaintiffs at the time of distribution equal or
exceed that sum, without regard to whether other creditors
exist who do not choose to come in as plaintiffs.   This is a
very important question, upon which substantially no aid
has been given us by counsel further than the assertion of
their differing views.   Under such circumstances we have
hesitated much whether we ought to decide it, but have
reached the conclusion that we should do so as essential to
disposal of respondents' objection to the entertainment of
the suit at all, and also because it must be resolved in render-
ing final judgment; so that silence now may be productive
of much protraction of this litigation by necessitating an-
other appeal, and perhaps a second accounting and judg-
ment.

In adjusting statutory liabilities of stockholders or other
officers, where restricted at all, two limits resulting from
proportion have at times been insisted on: first, that no
stockholder should be held for more than would be his rat-
able proportion if all stockholders similarly liable responded
for their shares; secondly, that stockholders should be liable
to any creditor or creditors less than all for no more than
would be their liability to the same creditors if all were
present and demanding to participate in the shareholders'
liability.

The first of these limitations, though not urged here, we
have examined so far as we have been able, without finding
that it has ever been applied under a statute like ours.
Under various statutes which differ from sec. 2024, subsec.

Rehbein and others vs. Rahr and another.

47, by containing the provision that stockholders shall be liable "ratably" or "in proportion to their holdings," such limit has been declared and enforced, but has quite uniformly been ascribed to such differentiating words. In *Crease v. Babcock*, 10 Met. 525, 555, the statute imposed on stockholders individual liability for unpaid bills of a bank in "proportion to the stock they may respectively hold." Under this it was held that the shareholder was liable only for such proportion of the whole indebtedness as his stock bore to the total stock, although some of that total was held by the corporation itself and some by insolvent individuals. In *In re Hollister Bank*, 27 N. Y. 393, the language construed was: "The stockholders shall be individually responsible equally and ratably . . . for the amount of such debt to the extent of their respective shares." The debts ascertained were directed to be apportioned among them "ratably in proportion to their stock." The court, in enforcing the same limit as in the *Crease Case*, pointed out that under an earlier law, substantially identical with sec. 2024, subsec. 47, no such limit could be enforced, but that each stockholder would be liable up to the face of his stock, so far as necessary to satisfy the debts, regardless of the duty of others. These two cases, with others less significant, were cited as support for the decision in *U. S. v. Knox*, 102 U. S. 422, under the national bank act (sec. 5151, R. S. of U. S.): "The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares." This language was held to warrant the rule that each shareholder shall contribute such share of the whole debt found as his stock bears to the total capital stock. That amount could not be increased by reason of the insolvency of other stock-

holders. *First Nat. Bank v. Winona P. Co.* 58 Minn. 167; *Clarke v. Cold Spring O. H. Co.* 58 Minn. 16; *Brundage v. Monumental G. & S. M. Co.* 12 Oreg. 322; *Holmes v. Sherwood*, 16 Fed. Rep. 725; *Umsted v. Buskirk*, 17 Ohio St. 113, 118; *Barrick v. Gifford*, 47 Ohio St. 180; *Herrick v. Wardwell*, 58 Ohio St. 294, 306. On the other hand, liability to the full face of the stock, in the absence of *pro rata* limitation, is apparently sustained by the following authorities, although the question was not very fully debated: *Briggs v. Penniman*, 8 Cow. 387; *Bank of Poughkeepsie v. Ibbotson*, 24 Wend. 473; *Garrison v. Howe*, 17 N. Y. 458. We are satisfied that the latter rule results from a statute such as ours. In the absence of the words therein, "to the amount of their respective share or shares of stock," liability would rest on every stockholder individually for the whole amount of the debts due any plaintiffs. The only limitation upon such liability is the amount of a defendant's stock. The conclusion seems irresistible that he can insist on no other, but must respond as he would be required under the unlimited statute until the limit is reached.

The second theory of limitation, namely, to such proportion of the face of the stock as the plaintiffs' claims bear to all the debts of the corporation, is equally unsupported by any authority which has come to our notice. Substantially all courts, as above stated, have declared this statutory liability to be primary and absolute, a contract debt from each stockholder, for which any creditor might sue and recover in full, but for equitable considerations which have led the courts in many states, including Wisconsin, to hold that, to prevent inequality and preferences, any such creditor must proceed in equity, so that the opportunity can be given to other creditors to share in the fund, if they see fit to demand it, and stockholders' rights to contribution can be protected if they choose. *Coleman v. White*, 14 Wis. 700; *Finney v. Guy*, 106 Wis. 256, and citations; *Whitman v. Oxford Nat. Bank*, 176 U. S. 559, 565.

This holding as to the remedy does not differentiate the liability in those states maintaining it from the liability under similar statutes in states whose courts have allowed enforcement either at law or in equity, notable among which is New York. The stockholder is still bound to any creditors who sue to pay an amount equal to his stock, if necessary to discharge such debts. The creditor must, however, share his right with any others who, on due notice, ask participation. Such is the force of the Wisconsin decisions. The liability, as between the stockholder and creditor, is none the less several because, as between stockholders, it is proportional, nor because, as between creditors, the participation is *pro rata*. *Umsted v. Buskirk*, 17 Ohio St. 113; *Herrick v. Wardwell*, 58 Ohio St. 294.

Confusion upon this subject will be avoided by remembering that in theory all creditors of the corporation are plaintiffs in this action. *Barrick v. Gifford*, 47 Ohio St. 180; *Richmond v. Irons*, 121 U. S. 27, 51. It appearing reasonably certain that the total claims of all such creditors exceed the face of the stock held by the solvent shareholders, it is proper to adjudge full liability against the latter, saving, in the enforcement of any such judgment, the contingency of such full liability not being required. *Gianella v. Bigelow*, 96 Wis. 185. True, after settling the fact and amount of defendants' liability, which may now be done by interlocutory judgment (sec. 2883, Stats. 1898), it will remain for the court to ascertain the exact personnel of the plaintiffs, and their relative rights in the fund. Sec. 3227, Stats. 1898, points out a method. When that is done, however, it is conclusive both in favor of and against all parties. *Richmond v. Irons*, 121 U. S. 66. Thereafter, for the purpose of enforcing or sharing in the stockholders' obligation, no one is a creditor save those who have joined as plaintiffs. They are thereby conclusively adjudged to be all the creditors of the corporation in practical effect. Defendants will have

Rehbein and others vs. Rahr and another.

the full benefit of such adjudication, for no other creditor can ever proceed against them. *Finney v. Guy*, 106 Wis. 256; *Eau Claire Nat. Bank v. Benson*, 106 Wis. 624. No reason is apparent why the defendants should not, therefore, be held to the same liability as if the fact so adjudicated were literally true, and be compelled to pay in up to the full limit of their stock holdings, if the claims of the creditors ultimately appearing equal or exceed that amount.

The views above expressed of course result in the conclusion that the judgment dismissing the complaint must be reversed, and that the defendants must be held liable as holders of shares of the par value of $2,500. The circuit court must proceed to judgment giving effect to such liability. In so doing it may meet complications and conflict of rights demanding the broadest of its equity powers, and taxing the elasticity of equitable procedure and administration. The final judgment in a case of this kind is drastic in its results, and forecloses important rights on both sides. It excludes all creditors not parties to it from any share in the fund realized from the liability adjudged, and also excludes all creditors from any demand upon any omitted stockholders. *Finney v. Guy, supra; Eau Claire Nat. Bank v. Benson, supra.* Further, it excludes the defendants who may thereby be compelled to pay from any claim for contribution against such omitted stockholders, equally liable, whether within the jurisdiction or not. *Foster v. Posson*, 105 Wis. 99. The most ample opportunity should, therefore, be extended, so far as consistent with orderly practice, to bring in all parties whose rights or liabilities may be affected. The extinguishment of rights of nonplaintiff creditors is a deprivation of property which they should suffer only after due process of law, namely, a notice so framed and served as to fully warn them of their rights and the peril thereto if they neglect the opportunity to join in the suit. The ordinary practice of courts of equity in such circumstances is but confirmed by

sec. 3227. The election of the present plaintiffs to omit from the action any stockholders because of their insolvency, or for any other reason, should not preclude any of the other parties nor the court from bringing them within its jurisdiction if their presence can facilitate protection of any rights of contribution or otherwise. Present insolvency is not necessarily conclusive of futility in an adjudication of the rights and liabilities of the parties, nor of the ultimate impossibility of their enforcement, if not finally cut off by the judgment. Again, the defendants may themselves be creditors either by original dealing with the bank or by assignment of or subrogation to the claims of others. Their rights, if any, in that respect, can and should be protected. *Commercial Bank v. Azotine Mfg. Co.* 66 Minn. 413; *Killen v. Barnes*, 106 Wis. 546. Interests held by the same individual on both sides of the line separating plaintiffs from defendants offer no obstruction to complete justice in courts of equity. *Spaulding v. North Milwaukee T. S. Co.* 106 Wis. 481.

*By the Court.*— Judgment reversed, and cause remanded for further proceedings according to law.